The **PEOPLE** of the State of Colorado, Plaintiff-Appellee,

v.

**Edward Rudolph MONTOYA, Defendant-Appellant.**

Nos. 77–640, 77–783.

Colorado Court of Appeals, Division II.

May 1, 1980.

As Modified On Denial of Rehearing May 22, 1980.

Certiorari Denied Aug. 25, 1980.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., Nathan B. Coats, Asst. Atty. Gen., Denver, for plaintiff–appellee.

Gerash & Springer, P. C., Scott H. Robinson, Walter L. Gerash, Denver, for defendant–appellant.

STERNBERG, Judge.

Defendant, Edward Rudolph Montoya, appeals his conviction of conspiracy to possess for sale a narcotic drug. We affirm.

Montoya's conviction stems from extensive and long term investigation of drug trafficking in and around Pueblo, Colorado. The investigation, which focused largely on the activities of Montoya who was believed to be the head of a large heroin and cocaine distribution organization, was initially unsuccessful because of Montoya's alleged refusal to deal with anyone he did not personally know. Therefore, a Denver Police Department detective assigned to the Attorney General's ·Organized Crime Strike Force, by affidavit, requested wiretap authorization for three telephones, two of which were subscribed to by associates of

Montoya and one, in his wife's name, was located at Montoya's residence in Pueblo.

The 29–page affidavit included information from four confidential informants, designated "A," "B," "C," and "D," as well as other information obtained through police investigation. The crux of the affidavit was that Montoya was using the telephones to run a drug distribution operation. The wiretap request was granted by District Judge Philip J. Cabibi on October 20, 1974, and interception of telephone calls commenced on October 22, 1974.

On October 28 and 29, 1974, information obtained from monitored calls indicated that a drug transaction was imminent. Conversations between Montoya and one Ben Maciel suggested that Maciel was about to leave on a trip for the purpose of obtaining illegal drugs. Investigators staked out the Maciel residence in Colorado Springs and observed Montoya deliver to Maciel a business–sized envelope allegedly containing money. Maciel was then followed to the airport; he flew to Denver and then to Tucson. In Tucson he was followed to a motel where he met a John Peebly. He was later followed to the Mexican border on two occasions. Upon his return from the second trip to Mexico, agents observed him taking a wrapped bundle to his motel room. Later that day, agents observed Maciel and Peebly secreting newspaper covered parcels in an automobile. Maciel was followed back to the airport where he boarded a plane for Denver. Peebly, in the automobile, was tailed, with the aid of an electronic device known as a "bumper–beeper", as he traveled toward Colorado.

Shortly before the Peebly vehicle reached the Pueblo County line, officers of the Pueblo Police Department picked up Judge Cabibi at his home, provided him with an affidavit requesting a search warrant for the Peebly vehicle, and drove him at high speed to the county line where a road block had been set up. There the affiant was sworn and signed the affidavit before the judge, who then authorized the search. The automobile, which had previously been stopped, was searched and a quantity of heroin seized.

An information was subsequently filed against Montoya charging him with employing another to transport a narcotic drug, conspiracy to employ another to transport a narcotic drug, possession for sale of a narcotic drug, and conspiracy to possess for sale a narcotic drug. He was convicted of the last offense only.

Prior to trial, Montoya filed motions to suppress the conversations seized as a result of the wiretap and the evidence obtained from the search of the Peebly vehicle. These motions were denied.

### I. *The Wiretap*

Montoya correctly maintains that his conviction could not have been obtained absent introduction at trial of the recorded telephone conversations. He asserts two grounds upon which these conversations should have been suppressed: First, that there was insufficient evidence of present probable cause for issuance of the wiretap authorization; second, that the facts and circumstances set out in the affidavit requesting the wiretap were insufficient to permit an independent determination of reliability of the confidential informants. We disagree with both assertions.

A court order authorizing the wiretapping of telephonic communications must be scrutinized under the same stringent standards as other Fourth Amendment searches and seizures. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). And, in Colorado affidavits in support of a request for an ex parte wiretap order must establish that there is probable cause to believe that evidence of specific enumerated crimes will be obtained through the substantial intrusion upon the individual's privacy. Section 16–15–102, C.R.S.1973. Dealing in narcotics is one of the enumerated offenses included in the wiretap statute. Section 16–15–102(1)(a)(VI), C.R.S.1973.

■ As stated in *People v. Peschong*, 181 Colo. 29, 32, 506 P.2d 1232, 1234 (1973), "[t]he standards of probable cause for issuance of a search warrant based on infor-

mation given to an affiant police officer by an unidentified informant are set forth in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)." *See also People v. Milnes*, 186 Colo. 409, 527 P.2d 1163 (1974). Under the *Aguilar–Spinelli* test, the affidavit must (1) provide sufficient underlying circumstances to enable the magistrate to determine independently whether there is probable cause to believe that illegal activity is being carried on in the place to be searched, and (2) set forth sufficient facts to allow the magistrate to determine independently that the informant is credible or his information reliable. *People v. Lucero*, 196 Colo. 268, 583 P.2d 287 (1978).

### A. *Underlying Circumstances*

We note initially that a substantial amount of information in the affidavit is either extraneous or innocuous, and thus could not serve alone as the basis for a determination of probable cause. Also, included in the affidavit is some information which is allegedly erroneous. However, if after striking this information probable cause still exists, the wiretap authorization must be sustained. *See People v. Hampton*, 196 Colo. 466, 587 P.2d 275 (1978).

■ We conclude that the information in the affidavit provided a sufficiently detailed statement of underlying facts and circumstances upon which the authorizing court could reasonably conclude that the telephones were being used in connection with illegal drug activities, thereby satisfying the first prong of the *Aguilar–Spinelli* test.

Informants "A" and "C" related personal knowledge of Montoya's illegal enterprise. At the time they made their statements, both informants asserted that Montoya's drug activities had been carried on for several years. Police investigation, as presented by the affiant, also indicated that a long–standing drug distribution organization was involved. In March of 1974, informant "A" stated specifically that he had been in the Montoya residence "within the last six months," and had overheard drug transactions being arranged by Montoya

over the telephone. He also related that Montoya had solicited him for the purpose of selling heroin.

Informant "C" related that he had purchased heroin from Montoya on from six to ten occasions, the most recent being in the later part of 1973. He stated that some of the arrangements for the purchases were made by Montoya over the telephone. The affidavit states that on June 11, 1974, informant "C" introduced agent Kenneth Brown to Montoya for the purpose of arranging a drug purchase, and that arrangements were made, and sales of heroin took place, on June 13, June 24, and July 19, 1974. The affidavit asserts that the purchases were made from Maciel who stated to agent Brown that he handled most of Montoya's business.

Montoya next asserts that the information in the affidavit upon which the determination of probable cause could have been based was "hopelessly stale" and therefore inadequate to support the issuance of the wiretap authorization. We disagree.

■ It is true that the element of time is crucial to a determination of the existence of probable cause, *United States v. Johnson*, 461 F.2d 285 (10th Cir. 1972); *see People v. Bauer*, 191 Colo. 331, 552 P.2d 512 (1976); and if information provided the issuing magistrate does not reasonably demonstrate that the suspect is continuously engaged in criminal activity, a warrant based on dated, or "stale," evidence is invalid. *People v. Erthal*, 194 Colo. 147, 570 P.2d 534 (1977). Probable cause ceases to exist when it is no longer reasonable to presume that the criminal activities are still being carried on in the place to be searched. *United States v. Brinklow*, 560 F.2d 1003 (10th Cir. 1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978).

■ In the instant case, it was not unreasonable for the trial court to conclude that at the time the wiretap was authorized, criminal activities continued to be carried on through the use of Montoya's telephone. Unlike the situation in *People v. Erthal, supra*, where a search warrant based on an affiant's observation of easily disposed of stolen goods in a carpenter's shop two

months prior to the request for the warrant was held invalid, the information here indicated a long–standing and continuous conspiracy to distribute narcotics. The court in *Erthal* noted that, in that case, there was no indication that the suspect continuously engaged in criminal activity, or continued to use feloniously obtained tools. Here, the facts support precisely the contrary inference; thus, the age of the information does not, under the circumstances, render this wiretap authorization invalid. *See United States v. Brinklow, supra,* (11–month–old information held sufficient to support issuance of search warrant). *See also United States v. Hyde,* 574 F.2d 856 (5th Cir. 1978); *United States v. Kirk,* 534 F.2d 1262 (8th Cir. 1976).

### B. *Credibility of Informants*

█ We also disagree with Montoya's contention that the reliability of the information provided by the confidential informant was not established, thus failing the second prong of the *Aguilar–Spinelli* test.

The credibility of informant "A" was satisfactorily established by the statement in the affidavit that he had "been proven reliable by providing information concerning numerous cases on a continuous basis for the last three years in which quantities of narcotics and dangerous drugs were confiscated and several arrests were made on the drug violations . . . ." *See People v. Lucero, supra; People v. Peppers,* 172 Colo. 556, 475 P.2d 337 (1970). Similarly, the credibility of informant "C" was established by the averment in the affidavit that he had been "proven reliable by supplying information to agents of the Organized Crime Strike Force about persons trafficking in narcotics and drugs, which information proved correct in each case and in fact resulted in undercover agents of the Strike Force purchasing narcotics and drugs from these persons and felony cases are now pending." *Lucero, supra; Peppers, supra.*

Moreover, there is internal consistency between the information provided by informants "A" and "C" as well as that provided by informants "B" and "D," which lends credibility and reliability to that information. *United States v. Hyde, supra.* And,

as reflected in the affidavit, independent police investigation, most notably the drug purchases of Agent Brown which were arranged by Montoya, also supplied independent verification of certain aspects of the informants' information, again bolstering its reliability. *See United States v. Hyde, supra. Cf. People v. Montoya,* 189 Colo. 106, 538 P.2d 1332 (1975).

Thus, although the indicia of credibility of the informants and the reliability of their information could have been stronger and more detailed, we cannot say as a matter of law that the indicia were insufficient. *People v. Lucero, supra.*

### II. *Search of the Peebly Vehicle–"Attached Magistrate"*

█ Montoya next contends that the search warrant for the Peebly vehicle was invalid because it was not authorized by a detached and neutral magistrate. Montoya asserts that Judge Cabibi, the authorizing judge, was so involved in the police investigation of this case as to make him an "attached magistrate." As evidence of this lack of neutrality he points specifically to the fact that Judge Cabibi was rushed to the county line so that the search warrant could be executed. We are not persuaded by this argument.

We note initially that the affidavit, even excluding that information which Montoya alleges to be erroneous, provides sufficient probable cause upon which a search warrant could properly issue. *People v. Hampton, supra.*

The United States Supreme Court recently addressed the issue of the "attached magistrate" in *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). There, a judge authorized a search warrant for the seizure of two reels of "obscene" film; he then accompanied police officers to the store where the films were sold and for approximately six hours assisted the officers in determining whether probable cause existed for the seizure of other merchandise which had not been designated in the warrant. The court stated that at the time of the general search "there was not sufficient probable cause to pursue a search beyond looking for addi-

tional copies of the two specified films, assuming the validity of searching even for those." *Lo–Ji Sales, Inc. v. New York, supra*, 442 U.S. at 325, 99 S.Ct. at 2324, 60 L.Ed.2d at 928. The court concluded that by participating in the search, the judge acted not as a judicial officer but as an adjunct law enforcement officer.

However, the circumstances here are significantly different. Here, the extent of the judge's participation in the search was restricted to an examination of the affidavit, the swearing of the affiant, and authorization of the warrant based on probable cause. The fact that he was not in his regular office at the time he authorized the search, and made himself readily available to law enforcement officers, does not alter his character as a neutral and detached magistrate. *See Lo–Ji Sales, Inc. v. New York, supra*, 442 U.S. at 328, fn. 6, 99 S.Ct. at 2325, fn. 6, 60 L.Ed.2d at 930, fn. 6.

### III. *Other Contentions of Error*

Montoya next contends that his conviction is void because the case was prosecuted by members of the Attorney General's office whose appointments as special prosecutors for the District Attorney were invalid. Montoya asserts that because such appointments are contrary to the rules announced in *People ex rel. Brown v. District Court*, 196 Colo. 359, 585 P.2d 593 (1978), and *People ex rel. Tooley v. District Court*, 190 Colo. 486, 549 P.2d 774 (1976), his motion to dismiss for lack of jurisdiction should have been granted. We do not agree.

Intervention by the Attorney General in the prosecution of this case does not mandate reversal. *See Gillies v. Schmidt*, 38 Colo.App. 233, 556 P.2d 82 (1976). The eligibility of members of the Attorney General's office for appointment as special prosecutors has no bearing on the ultimate determination of guilt or innocence; even if ineligible as special prosecutors, the members of the Attorney General's office acted as *de facto* officers whose authority to prosecute Montoya may not now be challenged. *Glavino v. People*, 75 Colo. 94, 224 P. 225 (1924).

We also reject Montoya's contention that reversal is required because on several occasions during jury deliberations the jury foreman revealed to the bailiff the numerical division of the jury on the question of Montoya's guilt.

In order to have a verdict set aside because of improper or unauthorized communications with the jury, it is incumbent upon the defendant to show that he was prejudiced thereby; a determination of that issue is within the sound discretion of the trial court. *People v. Davis*, 183 Colo. 228, 516 P.2d 120 (1973); *People v. Hunter*, Colo.App., 607 P.2d 1026 (1979). The trial court denied Montoya's motion for a new trial which specifically raised the issue of improper juror–bailiff communications. Because Montoya has failed to demonstrate any prejudice from this incident, there was no error.

Error is also assigned to the trial court's refusal to submit to the jury two instructions tendered by Montoya. Again, we disagree.

Montoya asserts that his tendered instructions set forth a theory of the case not encompassed in the instructions submitted to the jury: That he merely associated with certain individuals who committed criminal offenses, but did not conspire with them. We view the tendered instructions as constituting a general denial, rather than a specific theory of the case, *see Marn v. People*, 175 Colo. 242, 486 P.2d 424 (1971), and conclude that because the jury was properly instructed as to the proof required for conviction of conspiracy, there was no error. *LaFeve v. People*, 177 Colo. 67, 492 P.2d 852 (1972).

Finally, Montoya contends that he was sentenced under the wrong statute. This contention is without merit.

In the caption of the indictment under which Montoya was tried and convicted he was charged with conspiracy under both C.R.S.1963, 40–2–201, as amended, the general conspiracy statute under the criminal code, and C.R.S.1963, 48–5–20, as amended, which proscribed conspiracies to violate certain statutory provisions specifically applicable to "Drugs and Druggists." Montoya was sentenced under C.R.S.1963, 48–5–20,

as amended. He argues that because he was charged with violation of both statutes, an ambiguity existed which should have been resolved in his favor, and therefore he should have been sentenced under the less stringent provisions of C.R.S.1963, 40–2–201, as amended. We disagree.

Although the caption of the indictment did charge Montoya with both conspiracy offenses, the body of the indictment refers specifically and solely to C.R.S.1963, 48–5–20, as amended. The jury was instructed as to the elements of that offense, and returned a guilty verdict on the charge of "conspiracy to commit possessing for sale a narcotic drug with intent to induce or aid another to unlawfully use or possess a narcotic drug." We therefore conclude that Montoya was sentenced under the correct statute.

The judgment is affirmed.

ENOCH, C. J., and RULAND, J., concur.